I think the basic, strongest reason, Your Honor, is that there was no medical evidence supporting the arbitrator's decision that the injury occurred from a military push-up. All the treaters, the IMEs, all the evidence, the medical evidence, nothing supported a military push-up as the cause. All supported that it happened as Petitioner described it, at work. Well, whose burden is it? The respondent doesn't have to prove that there was not a causal connection, there was not a work-related accident. That's your burden to prove. That's correct. So whether or not there was a military-style push-up that caused the problem doesn't end the inquiry, does it? Well, the significance is, Your Honor, that the arbitrator stated that it did not happen at work, it was caused by the military push-up. Of which there was substantial evidence, was there not? No, as far as, I mean, the evidence, there was some evidence by Mr. Wizzowati that Petitioner supposedly told him that after the accident occurred at work, that he also had a military push-up incident at home. That's basically the only evidence that, as far as I know. Well, you have Mrs. Wizzowati and you also have Robert Wizzowati, correct? Right, and they testified, and as far as their testimony at the hearing was, Mrs. Wizzowati did not recall any military push-up matter occurring at the home. So as far as, so that, I believe, Your Honor, is the only evidence. So let me get the timeline right here. You're saying Robert Wizzowati, okay, is Paramore's brother. Right. He testified to this military push-up, didn't he? He testified, he didn't, he never said he saw it. He only said that he had a conversation with Petitioner where Petitioner mentioned it. Right, that he injured himself at home while doing that military push-up. Your Honor, I believe that the testimony was, that Mr. Wizzowati's testimony was, Petitioner said he got injured at work, and then he said that something, in addition to what happened at work. That was my question. You're saying that Mr. the claimant said I was injured at work first, right? Correct. And that's how Mr. Wizzowati recalled it, that he had a conversation, and Petitioner told him that after he had been injured at work, he had this military push-up incident at home. What happens when the arbitrator makes it very clear that he finds the claimant not credible and points out several instances where the claimant is not credible? Where do we have anything from the claimant at all? Well, I think, Your Honor, with all due respect to the arbitrator, I think that the specific matters that you refer to were not supported by the record. As far as she talks about that, as far as what happened at home, the military push-up matter, as far as that, I think, was addressed. And as far as she doesn't refer to anything regarding any medical evidence, as far as, and I think she also ignores what's significant about right when the petitioner gets injured at work, he reports it normally. There's two company witnesses that describe what happened, and they all describe it as in the normal course of business, the way it was reported. Nothing was unusual, and they had detailed notes. The arbitrator referred to some specific things about later matters in Arizona, for example, but the record of any later incidents in Arizona, nothing refers to, nothing in the records referred to a cervical injury or an injury to the shoulder. So I think... Who witnessed the incident? There are no witnesses besides the petitioner. All right. So this really, to be candid and blunt about it, it really sort of basically hinges on the credibility of your claimant, of your client, doesn't that? I think that's only a part of it. Certainly credibility is a factor, but I think the record, you have him reporting it right away. You have two company people that testify, and they both describe the way it was reported. And as far as, you have to also consider, if it didn't happen the way the petitioner said it happened, how else could it have happened? And he describes it happening at 10 a.m. He was at work at 7.30 a.m. So if something happened prior to his injury at work, how could he be working with a serious injury? What you're ignoring is all of the contradictory impeaching evidence in this case. Let me just summarize it generally, okay? He asserts that he had problems with his neck and numbness on the left side immediately after the alleged work injury. It was contradicted by the medical records and by Bertrand and Hynek's testimony. In addition, he told Dr. Thedepy about the alleged work accident in 1994. That's contradicted by the doctor's own records. He testifies he received medical treatment between August and November of 92. There's no medical documents supporting that. He can't even name any of the treating physicians. Doesn't that cast some doubt on his credibility? Well, as far as specifically, I would say no because, first, you're talking about the, as far as Hynek and Bertrand, he talks about a shoulder injury. As far as whether or not he doesn't specifically refer to the neck, if your assumption is that's showing a problem with his credibility, we have the orthopedic surgeon, Dr. Zipnick, testify that it certainly could have been masked as far as the way he initially reported it. And you have the first two doctors he sees, he certainly is reporting a problem to the shoulder. And as far as, and I think what's also important from Dr. Mel who did the shoulder surgery, he said there's no way that a military push-up could have caused the labral tear. No way. Absolutely certain, positive, no way it could have happened there. So I think the credibility issue is more, it certainly explained the record as far as if you look at. Now, which doctor was that? That was Dr. Zipnick. It was an IME doctor. Now, did he know anything about this military push-up? Yeah, he was asked about it. He certainly was asked about it, and he said it definitely, it was probably, probable that it would not have happened from a military push-up. And Dr. Kerr, on the other hand, said that it could have been caused by the military-style push-up, didn't it? No. He didn't say it could have been caused? My review of his, I don't recall him, I mean, as far as he certainly didn't say it to a reasonable degree of medical certainty. And you have Dr. Zipnick saying it to a reasonable degree of medical certainty, and you have Dr. Mel saying to a reasonable degree of medical certainty that it could not have happened by the military push-up, and it did happen the way Petitioner described the mechanics from the work injury as a welder. Well, your position is the work injury, obviously, you have to argue, caused the condition of the claimant's ill-being. What do you make of the fact that the claimant repeatedly postponed treatment and missed follow-up appointments following the date of this alleged severe injury? Well, as far as he's treated through August, that's clear, and it's in the record that he tries to get treatment in October, and it's refused. Well, did he or did he not cancel and miss appointments? He may have postponed one or two, but as far as he's going to work every day on light duty, that's clear. He's going to work every day after the injury light duty. As far as if there was one or two that were postponed, he described it in the record as far as the reasons. He was conscientious about it, going to the treatment. It's clear as far as the doctors say that he certainly had a condition, a shoulder condition, right away, and as far as the treatment you mentioned earlier, as far as the treatment was denied between August and the time he had the cervical fusion in November. So as far as what he said, and I think the arbitrator got it wrong, but she's saying what he said was, I don't recall any treatment in that period, and what actually happened, what the record shows, he's denied treatment in October. He doesn't have any treatment since August through November when he has the fusion. Now, what do you make of this? And I've been waiting to ask, and I'd love to hear your explanation. Your client's asked during cross-examination whether he ever told anyone that he had injured himself at home and intended to perpetrate a work-related injury that was false. Did he not say that was a possibility? That's not, as far as the exact words, Your Honor, from the record he states, and this is from the last two pages of this cross-examination. He says, I may have said I got a claim or not. It's a possibility. As far as whether he understood the question, it is a good question. He's talking about a claim, and the way you stated it is definitely not in the record. And the way I just, so it's, he's certainly not saying that I made up something or I tried to do the military push-up. There's nothing in the record that he referred to. But on the other hand, he didn't deny saying that, did he? Something about a made-up claim. He didn't deny it, did he? All he states is, I may have said I got a claim or not. It's a possibility. As far as a claim, to me. What was the preceding question? What was the question that he responded to there? You're looking at the transcript. What was the question asked to him? Keep it in context. I don't have that cite as far as. What question he was asked? The question, I have the answer because, but I believe, I'm fairly certain what the question was, if he was asked about if he had any other claim or if he had a military, it may have been something about the military push-up. And he said? And he says, I got it. But the question was like a paragraph. And he's referring both to the, he's asked about the work injury and about the military push-up. So the answer about the claim, to me, is not clear as far as what he's referring to. By the way, none of this has anything to do with the arbitrator and the commission finding that the Wissowattis and Don were credible. You have all these problems besides that. And I think if you refer to what they said at the hearing, to me, that would be as far as compared to what Mr. Dunn said to him, Mr. Dunn, who was working with the adjuster. What Ms. Wissowatti said at the hearing, she doesn't recall seeing any military push-up at home. That's what she says. That's what she testified to at the hearing. As far as Mr. Wissowatti, I mean, they didn't damage, as far as, they didn't hurt him. And my view of what they testified to, as far as, he talked about getting injured at work. And they don't, neither of them saw any type of military push-up at home. So I think. Didn't the arbitrator credit her statements to Dunn and discredit her live testimony based on a history of violence and intimidation by your appointment? She did refer to that, Your Honor. And I would say it's interesting, I mean, if there's any reasonable, if that's a reasonable conclusion, why would, when she's testifying in court and she's cross-examined at the hearing, why wouldn't, if she was abused in the past, why wouldn't that affect her testimony when she's testifying live? Counsel, your time is up. You'll have time on rebuttal. Thank you. Counsel, please. Thank you. May we please have the courts? Counsel, good morning. Matt Novak on behalf of Chicago Bridge and Iron. A lot of the points that I'm prepared to make in my presentation have actually been brought out during the discussion with counsel for Mr. Howard. So I want to make at least a brief clarifying statement on one point of evidence, and that's Mr. Well, could you address Dr. Zipnick? He suggests that Dr. Zipnick and Mel are really very supportive. Could I address his contention that they're not very supportive? When I recall, I thought both doctors opined that at least the work accident didn't cause the conditions he complained of, particularly the work accident as he alleged it. Is that what you're referring to? Well, Dr. Zipnick in his deposition testified that the work injury caused his neck condition and necessitated the surgery. Okay. So could you rephrase the question for me? No. Okay. Go ahead. The point I wanted to make, at least the clarifying point, was that in regards to the testimony of Robert Wizzawati, I think there's been some confusion. I think that the way Mr. Wizzawati testified was that Mr. Howard told him about injuring himself while performing a military-style push-up. He then also testified that I think at a later time Mr. Howard told him that he had a work risk compensation claim. I don't think that he testified that he first had a work risk comp accident and then later had an intervening accident. Do you know what question was asked that preceded this issue? It seems to be unclear now or ambiguous. What Mr. Howard was asked when he responded to whether or not there was a possibility he had an injury at home. The first question, if I recall from the record, was very long-winded. It laid out, did you ever have an injury at home and then tell someone you were going to claim a work accident? And he said, I don't recall. I'm just trying to be honest. And then I think the follow-up question was, are you sure you ever did that? And he said it's a possibility. Now, I'm not quoting from the record. I don't have the record with me. In fact, I couldn't find it in our office. But that, I think, was the follow-up question. Are you sure, essentially? So I think what this case boils down to is the Commission's role in judging the credibility of the witnesses, assigning weight to their testimony, and drawing emphasis from the evidence in the record. Certainly the Commission could have drawn different inferences. I don't think so, but certainly it's a possibility. The inference that they drew is that Mr. Howard was not credible, that he had an injury at home, and that he planned to claim his injury related to a work accident, which was not witnessed. Those findings are supported by, I think, preponderance of the evidence in the record, and certainly are not against the manifest way of the evidence. But considering Mr. Dunn's testimony, the original statements by Ms. Wizzawati, Mr. Wizzawati's testimony, and finally the claimant's own testimony himself, where he said it's a possibility I may have told someone I was planning to claim an injury at home as related to a work accident. So your position is that we don't even have to get to any medical, really, because the accident never occurred? The Commission's finding was that the accident never occurred, or an accident occurred, but it occurred at home. Right. The accident that we're trying to seek compensation for. Correct. So that's all I have. If there are any other questions for me. Thank you. I refer to some of the points that were asked earlier as far as about Mr. Robert Wizzawati, for example. What he was asked, this is on the third page of his direct exam, he said the way the injury came back was doing a military push-up. So he's not questioning that there was the initial injury at work. As far as... Let me get back. I just don't understand even an appeal of this process. The arbitrator made it very clear in several pages that this claimant is not believable, not credible, and intends to carry over into this argument. Your Honor, I believe I addressed that in my rebuttal brief, but just to focus on a couple key points, what the arbitrator said, for example, referring to his testimony at the hearing that he did not recall receiving any medical treatment between August of 92 and November of 92. What he stated, it's possible, I don't know. And he's testifying a number of years later. And to me, of course, to find that answer not credible, I certainly question, as far as when the petition was asked at the hearing if he had told Dr. Mill anything about racquetball, for example. I was trying to describe what I felt when I moved my arm, and I also said baseball. So to me, as far as to find that not credible, certainly is distorting his answers at the hearing. As far as what happened in Arizona, the record shows that he never had a cervical injury in Arizona, and he never had a shoulder injury in Arizona. So to me, I think the arbitrator stretched to find it not credible because all the specific examples of what she referred to, I think the record clearly shows that it was not a question of credibility. It was either a question of not recalling, or the record said something very specifically contrary to the arbitrator's conclusion. Based on all this, and just one last point about giving any weight to Leo Dunn, who interviewed Ms. Wissowati and Mr. Wissowati. He's using a date of July 7, 1992, and the date of accident is June 5, 1992. He's telling them, and he's referring to July 7. So he's wrong. To give any weight to what he's saying, he has the date wrong. And why should we give any weight to what he's saying when he doesn't even have the right date? And July 7, just the chronology of the treatment, he's in treatment. Petitioner Mr. Howard is getting treatment from June 5 through August, consistently. So there's no change around July 7. None of the doctors talk about anything new, anything intervening on July 7. So just all these facts in the record, and from the testimony, show that that should have very little weight. Based on all the evidence in the record, and the facts, and the medical record, certainly, we believe in the present case the evidence compels a reversal. Thank you.